UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DALE WILLIAMSON,                                                                  Plaintiff,

v.                                               Civil Action No. 3:20-cv-266-DJH-RSE

UNIVERSITY OF LOUISVILLE,                                                      Defendant.

\* \* \* \* \*

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Dale Williamson alleges that Defendant University of Louisville (U of L) discriminated and retaliated against him in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. (Docket No. 14, PageID.81–83 ¶¶ 42–57)   U of L moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.   (D.N. 78)   Williamson opposes the motion and moves for summary judgment.   (D.N. 79; D.N. 86)   After careful consideration, the Court will grant the motion for summary judgment for the reasons set out below.

**I.**

Williamson "was a student at U of L during the summer 2018 semester."   (D.N. 78-25, PageID.696)   Before the start of the semester, Williamson provided U of L's Disability Resource Center (DRC) with documentation that he had a learning disability.   (D.N. 78-2, PageID.586)   The DRC then approved Williamson for academic accommodations, including extra time on tests and writing assignments.   (D.N. 78-3, PageID.612)   During the 2018 summer semester, Williamson enrolled in computer information systems course "CIS 250 Section: 50" taught by Professor Melissa Campbell.   (*Id.*)   On May 18, 2018, before the summer semester began, Nicholas Wright, U of L's Disability Resources Coordinator, emailed the DRC letter detailing Williamson's

accommodations to Professor Campbell.   (D.N. 78-4, PageID.614)   Wright advised that Williamson was "expected to contact [Professor Campbell] to discuss the[] accommodations." (*Id.*)   On June 23, 2018, Williamson emailed Professor Campbell and asked whether Wright had contacted her regarding his disability accommodations.   (*Id.*, PageID.616)   In that same email, he told Professor Campbell that he had reviewed the syllabus and that he would "likely . . . need extra time" to complete the assignments and tests.   (*Id.*)   Professor Campbell responded the next day and confirmed that she had received the information from Wright regarding Williamson's accommodations.   (*Id.*)   Professor Campbell then explained that (1) there was no "accommodation to be made" because assignments for online classes "[do not] have 'time limits' for how long" a student is able to complete them, and (2) because all assignments (five in total) are available on the first day, "assignment deadlines are not to be modified."   (*Id.*)   She further explained that Williamson would receive additional time for tests and instructed him to keep her posted on his progress.   (*Id.*)

On July 22, 2018, at 8:25 p.m., less than four hours before the assignments were due, Williamson emailed Professor Campbell "to inform [her]" that he was "having problems with [his] auto-reader working on all resources required for [the] class ([the] Pearson [eTextbook])."[1]   (*Id.*, PageID.617)   He explained that he would not be able to complete the journal assignment (one of five assignments) before the deadline.   (*Id.*)   He also stated that he would contact the DRC in the morning "to see if they kn[e]w of a solution."   (*Id.*)   Professor Campbell responded: "Please contact Pearson Technical support so they can log the issue.   Without that there [will not] be an extension." (*Id.*)   Williamson replied that an extension of time to complete the assignment is "an

---

[1] All mentions of Pearson throughout the Order refer to "the publisher of the eTextbook" used in Professor Campbell's course.   (D.N. 78-1, PageID.558)

accommodation that is provided" by U of L "to comply with federal civil rights," and that "[i]f [Professor Campbell is] unable to provide the reasonable accommodation [she] need[s] to notify [the] disability center and explain why." (*Id.*) He then provided Wright's contact information. (*Id.*) Professor Campbell responded that she was "aware" that U of L is required to comply with federal law and urged Williamson to "contact Pearson support so [that] they can log the information and provide a solution." (*Id.*) She also explained that they would work with Pearson to "determine the course of action moving forward," and that she would contact Wright the next day. (*Id.*)

Williamson did not respond to that email or provide an update, which prompted Professor Campbell to email him the next morning. (*Id.*, PageID.619) She asked whether Williamson was able to connect with Pearson regarding his technical issue and noted that he did not submit "any of the five assignments that were due last evening" despite the fact that his email "only mentioned" that he needed additional time to complete one journal assignment. (*Id.*) Professor Campbell also informed Williamson that she had copied Wright on her email—who was out of the office until the next day—and stated that she would update Williamson once she spoke with Wright. (*Id.*) In response, Williamson stated that Professor Campbell's refusal to "provide reasonable disability accommodation[s]" was a violation of U of L's disability policy and a breach of contract. (*Id.*, PageID.618) And he informed Professor Campbell that a "discrimination complaint" was being filed and that "all further [c]ommunication[] need[ed] to go through" the DRC "and or the appropriate staff that w[ould] be in contact with [her]." (*Id.*) Professor Campbell replied that she was "not sure" why Williamson felt she had denied him reasonable accommodations. (*Id.*) She further explained that she asked him to "notify Pearson of the technical issue [he] mentioned as the reason [he] could not complete one of the five assignments so that [they could] then determine

the length of time for [his] extension." (*Id.*) Williamson did not respond. Instead, he contacted Wright and stated that Professor Campbell "refused" to provide him disability accommodations. (D.N. 78-7, PageID.627) After not hearing from Williamson, Campbell sent her email exchange with Williamson to Wright and requested to speak with Wright "at [his] earliest convenience." (D.N. 78-5, PageID.621–22)

On August 16, 2018, Williamson filed his first grievance with U of L alleging that Professor Campbell "refused" his request for an extension of time to complete an assignment "in violation of the ADA, Section 504[,] and UofL policy." (D.N. 78-8, PageID.630) After reviewing the documentation provided by Williamson, Professor Campbell, and the DRC, and interviewing all of the relevant parties, Brian D. Bigelow, U of L's Title IX and ADA Coordinator, determined that the evidence failed to establish "by a preponderance of the evidence" that Professor Campbell had acted "inconsistently with UofL policy or the university's obligations to accommodate" Williamson's disability "in accordance with the ADA or Section 504." (*Id.*, PageID.635) Williamson subsequently filed a request for reconsideration of Bigelow's determination; however, Bigelow found that there was "no basis" to disturb the determination and denied Williamson's request. (D.N. 78-11, PageID.642–43) But Bigelow did preview that Williamson's arguments in his second grievance filed on October 31, 2018, regarding the contents of his DRC letter would be addressed in a separate memorandum. (*Id.*, PageID.643) Williamson had argued that his DRC letter did not specify whether the journal assignment qualified as a writing assignment, and Bigelow acknowledged that such a designation is important because it would mean that Professor Campbell "should have applied the 1.5x extension of the time to complete that assignment, and not the provision contemplating case-by-case consideration of extension requests." (*Id.*)

Upon further review of the DRC letter and Williamson's second grievance, Bigelow found that the DRC letter "did not sufficiently ensure that [Williamson] received needed accommodations" because it (1) "did not set forth the conditions under which requests must be given *favorable* consideration, so the student lacks assurance that any particular request would be granted," and (2) was unclear as to "what criteria the instructor may rely upon in determining whether or not an extension will be granted." (D.N. 78-12, PageID.646 (emphasis in original))  In light of this finding, Bigelow sought an adequate remedy for Williamson regarding the grade he received in CIS 250. (D.N. 78-13, PageID.649–54 (email exchange between Bigelow and U of L's Registrar Office); D.N. 78-15, PageID.659–61 (email exchange between Bigelow and Williamson))  Nevertheless, Williamson proceeded to file a complaint with U of L's Employee Relations and Compliance Office (ERCO) alleging discrimination by Professor Campbell, Bigelow, and DRC Director Colleen Martin. (D.N. 78-16, PageID.663–65)

As Williamson and U of L worked through the grievance process, Williamson enrolled in four classes during the fall 2018 semester. (D.N. 78-2, PageID.594–95)  He ultimately withdrew from two of the classes to "focus" on the grievance process. (*Id.*, PageID.596–97)  The withdrawals dropped his credit hours to six, which changed Williamson's status from a full-time to a part-time student and impacted Williamson's financial aid package for the 2018–2019 academic year. (*See id.*, PageID.597–98; D.N. 78-20, PageID.683–84 (Williamson's "Summary of Account"); D.N. 78-19, PageID.678–80 (Williamson's "Financial Aid Revision"); D.N. 78-18, PageID.670–75 (detailing the return of federal student aid for "recipients who are deemed to have 100% withdr[awn] from coursework after beginning attendance and/or participation"))  Williamson's Pell Grant was revoked, resulting in Williamson owing a balance to U of L and a hold being placed on his account. (*See* D.N. 78-20, PageID.684 (detailing the balance owed to U

of L after the revocation of the Pell Grant); D.N. 78-2, PageID.602–05 (detailing Williamson's deposition testimony regarding the revocation of the Pell Grant and the hold placed on his account before the 2019 spring semester))  And Williamson could not register for classes during the 2019 spring semester or receive his transcript until he paid the balance.  (D.N. 78-2, PageID.602–05)

On January 7, 2019, Williamson met with four U of L representatives—Thomas Hoy (General Counsel), Dr. Beth Boehm (Executive Vice President and University Provost), Dr. Angela B. Taylor (Assistant Provost for Student Affairs), and Colleen Martin (DRC Director)— to discuss (1) "[his] individual remedy for the grade and tuition associated with [the] CIS 250 course he took in the summer 2018 term," and (2) the "revisions made to any future accommodation letters" from the DRC.  (D.N. 78-22, PageID.689)  During that meeting, "Martin read the language in [Williamson's] revised accommodation letter."  (*Id.*, PageID.690) Immediately after the meeting, Martin emailed Williamson the new language.  (D.N. 78-24, PageID.694)  Five days later, U of L's ERCO dismissed Williamson's discrimination complaint, concluding that Campbell, Bigelow, and Martin had not discriminated against him based on his disability.  (D.N. 78-25, PageID.707, 717, 722)

Williamson then sued U of L, alleging discrimination, retaliation, and breach of contract. (D.N. 14)  U of L moved for dismissal pursuant to Rule 12(b)(6).  (D.N. 16)  The Court granted U of L's motion as to the breach-of-contract claim and denied it as to the discrimination and retaliation claims.  (D.N. 22)  Williamson then moved for summary judgment (D.N. 40; D.N. 41), for a hearing on his first motion for summary judgment (D.N. 56 (citing D.N. 40)), to amend his second motion for summary judgment (D.N. 63 (citing D.N. 41)), and for reconsideration of his breach-of-contract claim.  (D.N. 65 (citing D.N. 22))  The Court denied each motion.  (D.N. 82)

U of L now seeks summary judgment on all remaining claims.  (D.N. 78)  Williamson opposes the motion and moves for summary judgment.  (D.N. 79; D.N. 86)

## II.

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

At this stage, the evidence of the non-moving party is to be believed, *id.* at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party.  *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Nevertheless, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts."  *Id.* at 586.  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56I(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.

A.     **U of L's Motion**

1.     **Discrimination**

Williamson alleges that U of L discriminated against him in violation of Title II of the ADA, 42 U.S.C. § 12132; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  (D.N. 14, PageID.81–83 ¶¶ 42–57)   U of L moves for summary judgment, arguing that Williamson's disability-discrimination claims are (1) time-barred (D.N. 78-1, PageID.565–67), (2) not entitled to the application of the continuing-violation doctrine (*id.*, PageID.567–70), and (3) fail as a matter of law.  (*Id.*, PageID.571–77)   Williamson opposes the motion and argues that he has established a prima facie case of discrimination.  (D.N. 79, PageID.730–39)   Because Williamson's disability-discrimination claims fail as a matter of law, the Court need not address the other arguments raised by U of L.

"The Americans with Disabilities Act and the Rehabilitation Act combat discrimination against disabled individuals."  *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 681 (6th Cir. 2016).   And "[e]ach Act allows disabled individuals to sue certain entities, . . . that exclude them from participation in, deny them benefits of, or discriminate against them in a program because of their disability."  *Id.* (citing *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015); *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013)).   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  *Id.* (quoting 42 U.S.C. § 12132).   Similarly, § 504 of the Rehabilitation Act provides that "a qualified individual with a disability shall not, 'solely by reason of her or his disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *Id.* (quoting 29 U.S.C. § 794(a)).

"The Sixth Circuit has clarified that, aside from § 504's use of the word 'solely' and its limitation only to federally funded entities, 'the reach and requirements of both statutes are precisely the same.'" *K.C. ex rel. T.C. v. Bd. Of Educ. Of Marshall Cnty. Schs., Benton, Ky.*, 306 F. Supp. 3d 970, 977 (W.D. Ky. 2018), *aff'd sub nom. K.C. ex rel. T.C. v. Marshall Cnty. Bd. Of Educ.*, 762 F. App'x 226 (6th Cir. 2019) (quoting *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008)); *see id.* ("Claims brought under the ADA and Section 504 generally are evaluated together." (quoting *M.G. ex rel. C.G. v. Williamson Cnty. Sch.*, 720 F. App'x 280, 287 (6th Cir. 2018))); *R.K. ex rel. J.K. v. Bd. Of Educ. Of Scott Cnty., Ky.*, 494 F. App'x 589, 597 n.8 (6th Cir. 2012) ("[S]atisfaction of the § 504 requirements will also satisfy the requirements of Title II of the ADA."); *Gati v. W. Ky. Univ.*, 283 F. Supp. 3d 616, 626 (W.D. Ky. 2017), *aff'd,* 762 F. App'x 246 (6th Cir. 2019) ("[T]he analysis that applies to ADA claims also applies to claims made under the Rehabilitation Act." (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010))). Thus, "[g]iven the similarities in the two statutory provisions, [the Sixth Circuit has long] merged [its] analyses under the ADA and Rehabilitation Act." *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th 436, 452 (6th Cir. 2021) (quoting *Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 836 (6th Cir. 2020)). Williamson can therefore "defeat summary judgment" on his claims under each Act if he can make "either a direct or indirect showing of discrimination." *Id.* (citing *Gohl*, 836 F.3d at 682).

### a. Direct Evidence

"Direct evidence explains itself"—that is, "[i]t does not require the factfinder to make any inferences before concluding that unlawful discrimination happened." *Id.* (quoting *Martinez v.*

*Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013)).   Williamson did not

provide any direct evidence of discrimination in his response to U of L's motion for summary

judgment.  (*See* D.N. 79)  Instead, Williamson generally argues that the following communications

are direct evidence of discrimination: (1) his request for an extension in CIS 250 was denied or

refused when Professor Campbell instructed him to contact Pearson to address the technical issue

with his auto-reader rather than allowing him to communicate solely with the DRC about the issue,

and (2) his 2018 DRC letter required him to negotiate extensions every time one was needed.  (*Id.*)

These communications do not compel the conclusion that discrimination occurred, however.  *See*

*Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452; *A.C. ex rel. J.C. v. Shelby Cnty. Bd. Of Educ.*,

711 F.3d 687, 697 n.3 (6th Cir. 2013) ("[D]irect evidence of discrimination is, for instance, when

an employer says[,] 'I fired you because you are disabled'" (quoting *Smith v. Chrysler Corp.*, 155

F.3d 799, 805 (6th Cir. 1998))).

### i.  Emails with Professor Campbell

On Sunday, July 22, 2018, at 8:25 p.m., less than four hours before his assignments were

due, Williamson emailed Professor Campbell:

> I am writing you to inform you that [I] am having problems with my auto-reader
> working on all resources required for [the] class ([the] Pearson [eTextbook]).  I will
> be getting a hold of the disability center tomorrow tho [sic] [to] see if they know of
> a solution.  I will continue to work on [the] assignments, however I will not be able
> to have [the] journal done by [the] deadline and I am requesting extra time on [the]
> journal assignment.  I [a]ppreciate your understanding and hope to have [the] issues
> resolved soon.

(D.N. 78-4, PageID.617)  Professor Campbell responded at 8:38 p.m.: "Please contact Pearson

Technical support so they can log the issue.  Without that there [will not] be an extension."  (*Id.*)

At 10:09 p.m., Williamson then replied:

> The accommodation of extended time is an accommodation that is provided to [m]e
> by [the] University of Louisville to comply with federal civil rights.  I have given

> U of L['s] disability center the documentation that is required and they have notified
> you that I have been granted th[is] accommodation.  If you are unable to provide
> the reasonable accommodation you need to notify [the] disability center and explain
> why.  My U of L Disability Resources Coordinator is Nicholas Wright, he can be
> reached at nlwrig03@cardmail.louisville.edu or at (502)852-6938.

(*Id.*)  Four minutes later Professor Campbell responded:

> Yes[,] I am aware.  Please contact Pearson support so they can log the information
> and provide a solution.  Then we can work with them to determine the course of
> action moving forward.  I will contact Mr. Wright directly tomorrow.  Have a good
> night.

(*Id.*, PageID.616)  Williamson did not respond to this email, which prompted Professor Campbell

to email him on Monday morning.  At 9:29 a.m., Professor Campbell wrote:

> Were you able to connect with Pearson regarding your technical issue?  I noticed
> that you did not submit any of the five assignments that were due last evening.
> Your email only mentioned that you needed additional time for the journal.
>
> I have reached out to Mr. Wright (copied here) and received word that he is out of
> the office until tomorrow.  I have asked for a call when he returns to further discuss.
> I will update you once we have spoken.

(*Id.*, PageID.619)  At 2:21 p.m., Williamson responded:

> The refus[al] to provide reasonable disability accommodation [sic] U of L was a
> violation of U of L['s] disability policies and a breach of contract.  A discrimination
> complaint is being filed at this time and all further [c]ommunication[] need[s] to go
> through the disability Center and or the appropriate staff that will be in contact with
> you.

(*Id.*, PageID.618)  Professor Campbell replied at 2:25 p.m.:

> I am not sure why you feel I have denied you reasonable accommodations.  I asked
> you to notify Pearson of the technical issue you mentioned as the reason you could
> not complete one of the five assignments so that we can then determine the length
> of time for your extension.  Did you do that?
>
> I am concerned that you missed four additional assignments that you did not
> mention needing additional time for in your email yesterday evening.  When are
> you planning to complete those?

(*Id.*)  Williamson did not respond to this email.  In her deposition testimony, Professor Campbell explained that she asked Williamson to contact Pearson so that they could determine whether Williamson was experiencing "a technical issue or not," and that once Williamson contacted Pearson "[they] would work . . . to determine the course of action moving forward" regarding an extension.  (D.N. 78-6, PageID.624)  Professor Campbell's emails to Williamson do not on their own establish that Williamson was discriminated against based on his disability; instead, they require the Court to make impermissible "inferences before concluding that unlawful discrimination happened." *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452 (quoting *Martinez*, 703 F.3d at 916).  Thus, Professor Campbell's emails are not direct evidence of discrimination. *Id.*

### ii.  The 2018 DRC Letter

Williamson's argument regarding the 2018 DRC letter fails for similar reasons.  In light of Williamson's disability, the DRC letter outlined specific accommodations that Williamson had been approved to receive.  (*See* D.N. 78-3, PageID.612; D.N. 78-4, PageID.615)  The letter was provided to Professor Campbell on May 18, 2018, and stated that Williamson "has documentation of a qualifying disability on file with the Disability Resource Center, and has been approved for the following accommodations:"

> • Allowance to audio record lectures for use in personal study
> • Use of personal laptop for notetaking
> • Consideration for extended time for submission of written assignments on an assignment-by-assignment basis as expressed and arranged for in advance by student to instructor due to impact of students disability on this type of work.
> • Alternate format for texts and other print materials
> • Extended Time: 1.5x
> • Reduced distraction environment
> • Text to speech reading software (Kurzweil, Read Write Gold)
>
> The student is instructed to contact you to discuss specific accommodation needs.

(D.N. 78-4, PageID.614–15)  The plain language of the DRC letter does not provide any evidence that U of L discriminated against Williamson based on his disability.  (*See id.*)  In fact, the letter shows that U of L was aware of Williamson's disability, provided accommodations as noted, and notified Professor Campbell of those accommodations.  (*See id.*)  The DRC provided the letter to Professor Campbell months before the start of her class, outlined the specific accommodations, and provided resources for Professor Campbell to "learn more about strategies and faculty resources for making the classroom accessible for students with disabilities."  (*Id.*)

Although Bigelow later determined that the DRC letter "did not sufficiently ensure that [Williamson] received needed accommodations" (D.N. 78-12, PageID.647), such a finding is not on its own direct evidence that U of L discriminated against Williamson because of his disability. Rather, it was merely a conclusion that the DRC letter should have more precisely established the parameters for when an extension may or may not be denied.  (*See id.*)  It was not an admission of discrimination, however.  (*See id.*)  Any finding to the contrary requires the "inferential leap" that the DRC wrote the letter with the intent to discriminate against Williamson.  *See Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452 (noting that evidence that requires an "inferential leap" is not direct evidence of discrimination).  Moreover, after identifying the shortcomings in the DRC letter, U of L immediately updated the language regarding Williamson's approved accommodations (*see* D.N. 78-23, PageID.692), and informed Williamson of the changes.  (*See* D.N. 78-22, PageID.689; D.N. 78-24, PageID.694)  Thus, the DRC letter, the shortcomings contained therein, and U of L's update to the letter "[are] not direct evidence; there is 'no smoking gun.'"  *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452 (quoting *Gohl*, 836 F.3d at 683).  In sum, the Court would be required to make "inferences before concluding that unlawful discrimination happened"; however, such inferences are improper under the applicable standard for direct evidence of discrimination.  *Id.*

13

(quoting *Martinez*, 703 F.3d at 916).   Accordingly, Williamson can only survive summary judgment through an indirect showing of discrimination.   *See id.* (citing *Gohl*, 836 F.3d at 682).

### b.  Indirect Evidence

To prevail on an indirect showing of discrimination, Williamson "'must meet the requirements of the familiar *McDonnell Douglas* test,' which [courts] apply to both statutes." *Id.* (quoting *Gohl*, 836 F.3d at 682).   Williamson must make out a prima facie case of discrimination by showing that "(1) [he is] disabled; (2) [he is] 'otherwise qualified' to participate in the public program; (3) [he was] subject to discrimination because of [his] disabilit[y]; and (4) the program receives federal funding (for the Rehabilitation Act only)." *Id.* at 452–53 (citing *Gohl*, 836 F.3d at 682).   Williamson fails to meet this requirement.

There is no dispute that Williamson satisfies the first, second, and fourth elements of a prima facie case of discrimination; therefore, only the third element—causation—is at issue.  (*See* D.N. 78-3, PageID.612 (acknowledging that Williamson "has documentation of a qualifying disability" and that he has been approved for accommodations); D.N. 78-20 (detailing the federal funding provided to Williamson while enrolled as a student at U of L); D.N. 78-1 (arguing that Williamson fails to establish causation))  "[T]o establish the causation that both Acts require, 'the plaintiff must establish a but-for relationship between the protested act and the individual's disability.'" *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 453 (quoting *Gohl*, 836 F.3d at 682). The ADA requires Williamson to "present 'sufficiently 'significant' evidence of *animus* toward the disabled that is a but-for cause of the discriminatory behavior.'" *Id.* (quoting *City of Blue Ash*, 798 F.3d at 357) (emphasis added).   And § 504 requires Williamson to show that U of L and its employees "discriminated against [him] 'solely by reason of' [his] disability." *Id.* (quoting 29 U.S.C. § 794(a)).   Notably, under each Act, Williamson "must present evidence of how the school

treated comparable, non-disabled students." *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992)); *see Gohl*, 836 F.3d at 683.

As an initial matter, Williamson's response (D.N. 79) fails to provide any evidence that U of L or any of its employees had "animus toward the disabled that is a but-for cause" of the alleged discriminatory behavior, *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 453 (quoting *City of Blue Ash*, 798 F.3d at 357), or "discriminated against him 'solely by reason of' [his] disability." *Id.* (quoting 29 U.S.C. § 794(a)). Moreover, Williamson's response is devoid of any evidence regarding U of L's treatment of comparable, non-disabled students. (*See* D.N. 79) And such a failure is fatal to Williamson's ability to make a showing of discrimination via indirect evidence. *See Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452–53. In "'the absence of evidence of a well-treated comparator, [Williamson] cannot prove that discrimination against the disabled was the reason for' [his alleged] mistreatment." *Id.* at 453 (quoting *Gohl*, 836 F.3d at 683). In sum, Williamson's disability-discrimination claims fail because he has not provided any direct or indirect evidence from which a reasonable jury could find that he was "subject to discrimination because of" his disability. *Id.* (citing *Gohl*, 836 F.3d at 682). Accordingly, summary judgment will be granted as to Williamson's discrimination claim. *Id.*

## 2. Retaliation

Williamson next alleges that U of L retaliated against him because of the grievances he filed on August 16, 2018, and October 31, 2018. (D.N. 14, PageID.80 ¶¶ 30–31 (citations omitted)) Williamson specifically argues that on or about April 12, 2019, U of L (1) "refused" to provide him with a new DRC letter; (2) demanded he "repay money previously paid through a Pell Grant."; (3) "placed a hold on [his] transcripts and enrollment to prevent [him] from transferring to a different school that will provide actual accommodations for his disability"; (4) "refused to

allow [him] to attend classes unless he waive[d] his rights under ADA"; and (5) "refused to provide accommodations to [him] unless he signed a waiver stating UofL had not done anything wrong." (*Id.* at ¶¶ 29–33)   U of L argues that none of Williamson's allegations "are supported by the evidence" and that it is therefore entitled to summary judgment.  (D.N. 78-1, PageID.574)

Like his disability-discrimination claims discussed above, Williamson's retaliation claim is based on indirect evidence.  The evidence cited by Williamson requires the Court to make "inferences before concluding that unlawful discrimination happened"; therefore, it is not direct evidence.  *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452 (quoting *Martinez*, 703 F.3d at 916). The Court thus analyzes Williamson's retaliation claim "under the familiar *McDonnell Douglas* burden-shifting paradigm." *Kirilenko-Ison v. Bd. Of Educ. Of Danville Indep. Schs.*, 974 F.3d 652, 661 (6th Cir. 2020) (citing *Shelby Cnty.*, 711 F.3d at 697).  Under *McDonnell Douglas*, Williamson must first demonstrate a prima facie case of retaliation by showing that (1) he "engaged in protected activity under the ADA and Section 504"; (2) U of L "knew of the protected activity"; (3) U of L "took an adverse action against" him; and (4) "there was a causal connection between the adverse action and" his "protected activity." *Id.*  "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Id.* (quoting *Shelby Cnty.*, 711 F.3d at 697).  If Williamson demonstrates a prima facie case of retaliation, "the burden of production shifts to the defendant to show that it had 'a legitimate, non-discriminatory basis' for the adverse action." *Id.*  If U of L does so, the burden shifts back to Williamson "to show by a preponderance of the evidence" that U of L's proffered reasons "were not its true reasons, but were a pretext for retaliation." *Id.*  "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Id.* (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

There is no dispute that Williamson satisfies the first, second, and third elements of a prima facie case of retaliation; therefore, only the fourth element—causation—is at issue. (*See* D.N. 78-8 (U of L's determination regarding Williamson's first grievance); D.N. 78-12 (U of L's determination regarding Williamson's second grievance); D.N. 78-20, PageID.684 (detailing the balance owed to U of L after the revocation of the Pell Grant); D.N. 78-2, PageID.602–05 (detailing Williamson's deposition testimony regarding the revocation of the Pell Grant and the hold placed on his account before the 2019 spring semester); D.N. 78-1, PageID.574–77 (disputing Williamson's claim that U of L took an adverse action against him because he filed two grievances)) The Court will therefore consider whether Williamson has established causation.

### a. Prima Facie Burden (Fourth Element)

To show causation, Williamson "must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct." *Kirilenko-Ison*, 974 F.3d at 664 (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)). "In some circumstances, an inference of causation may arise solely from the closeness in time between the point at which [the defendant] learns of [the plaintiff's] protected activity and the point at which it takes an adverse action against that [plaintiff]." *Id.* Thus, the Sixth Circuit "has denied summary judgment where a defendant took adverse action against a plaintiff just a few months after learning of his or her protected activity." *Id.* (collecting cases).

Here, Williamson filed his first grievance on August 16, 2018, and his second on October 31, 2018. (*See* D.N. 78-8; D.N. 78-12) At least two of the alleged adverse actions—the revocation of the Pell Grant and the hold placed on his account—took place within a few months of Williamson filing his grievances. (*See* D.N. 78-20, PageID.684 (detailing the balance owed to U

of L after the revocation of the Pell Grant); D.N. 78-2, PageID.602–05 (detailing Williamson's

deposition testimony regarding the revocation of the Pell Grant and the hold placed on his account

before the 2019 spring semester))   Due to "the closeness in time" between the filing of

Williamson's grievances and at least two of the alleged adverse actions by U of L, the Court finds

that Williamson has established causation.   *See Kirilenko-Ison*, 974 F.3d at 664 (noting that an

adverse action taken "just a few months" after learning of a plaintiff's protected activity is

sufficient to establish causation (collecting cases)); *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir.

2007) ("The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put

forth some credible evidence that enables the court to deduce that there is a causal connection

between the retaliatory action and the protected activity.").   Accordingly, Williamson has

established a prima facie case of retaliation.   *See Kirilenko-Ison*, 974 F.3d at 664 (collecting cases).

### b.  Non-Discriminatory Reasons

Because Williamson has established a prima facie case of retaliation, the burden shifts to

U of L "to show that it had 'a legitimate, non-discriminatory basis' for the adverse action."   *Id.* at

661 (quoting *Shelby Cnty.*, 711 F.3d at 697).   As to Williamson's claim that U of L failed to provide

a new DRC letter, U of L offers evidence that on  January 7, 2019, it provided Williamson with an

updated DRC letter that "clarif[ied] when extended time should be given."   (D.N. 78-1,

PageID.574 (citing D.N. 78-23; D.N. 78-24))   U of L also explained and provided evidence to

support its argument that the hold on Williamson's account did not relate to his grievances; rather,

the hold stemmed from Williamson's "decision to withdraw from two classes in the fall 2018

semester."   (*Id.*, PageID.576 (citing D.N. 78-2, PageID.595–99))   U of L advised that

> [w]hen a student withdraws from a course, the University is required to abide by
> the Return of Title IV (R2T4) process to determine whether there was an
> overpayment of aid.  Here, because Williamson started the semester by receiving a
> Pell Grant, his decision to withdraw dropped him from full-time to part-time,

> resulting in unearned funds.  The University subsequently informed Williamson
> that his financial aid package was revised.  This resulted in a balance of $1,574.00,
> which, until paid, requires that a hold be placed on his account.  Therefore, the hold
> on Williamson's account, which prevents him from enrolling in classes or receiving
> a transcript, is not retaliatory in nature.  Rather, it is the result of Williamson's own,
> unrelated decision to withdraw from multiple courses in the fall 2018 semester.

(*Id.* (citing D.N. 78-18; D.N. 78-19; D.N. 78-20))  Moreover, U of L contends that Williamson's

allegations that U of L "demanded repayment and required him [to] waive his rights under the

ADA on April 12, 2019, are unfounded."  (*Id.* (citing D.N. 14, PageID.80 ¶¶ 29–30))  In support,

U of L directs the Court to the administrative summaries (concerning Williamson's discrimination

complaint) from U of L's ERCO, none of which "mention that Williamson is required to repay

any monies or waive any rights," or "that the University refused to provide Williamson with a new

DRC letter."  (*Id.*, PageID.576–77 (citing D.N. 78-25))  Accordingly, U of L has met its burden of

providing legitimate, non-discriminatory reasons for the adverse actions.  *See Kirilenko-Ison*, 974

F.3d at 661 (quoting *Shelby Cnty.*, 711 F.3d at 697).

### c.  Pretext

At the final stage of the *McDonnell Douglas* analysis, the burden shifts back to Williamson

"to show by a preponderance of the evidence" that U of L's proffered reasons "were not its true

reasons, but were a pretext for retaliation."  *Id.*  A review of Williamson's response (D.N. 79) and

deposition (D.N. 78-2) establishes that he fails to make such a showing.  At the outset, his response

does not provide any evidence that U of L's proffered reasons were not its true reasons.  (*See* D.N.

79)  In fact, Williamson's response does not address or dispute any of U of L's proffered reasons

outlined above.  (*Id.*)  And during his deposition testimony, Williamson stated that his retaliation

claim is based solely on the administrative summaries from U of L's ERCO—which had no

bearing on his grievances.  (*See* D.N. 78-2, PageID.601–10 (citing 78-25); *but see* D.N. 78-17,

PageID.667 (outlining deposition testimony of Donna Ernst explaining that U of L's Human

Resources Department (which includes the ERCO) only investigates Title IX and Title VII complaints "if the respondent is a faculty or staff member," not requests for academic accommodations or grievances))  The administrative summaries and the findings therein (D.N. 78-25) do not relate to Williamson's grievances, let alone provide any evidence that U of L's proffered reasons "were not its true reasons, but were a pretext for retaliation." *Kirilenko-Ison*, 974 F.3d at 661 (quoting *Shelby Cnty.*, 711 F.3d at 697).  Thus, Williamson fails to establish pretext.  *Id.* Accordingly, summary judgment will be granted as to Williamson's retaliation claim.  *Id.*

**B.      Williamson's Cross-Motion**

On March 25, 2023, Williamson moved for summary judgment on his disability-discrimination claims.  (D.N. 86)  U of L opposes the motion and argues that it should be denied because it is untimely and "provides no evidence to support [Williamson's] claim that he is entitled to summary judgment."  (D.N. 87, PageID.805)  And "[i]n the interest of judicial economy, [U of L] reiterates and incorporates by reference the facts and arguments within its own" motion for summary judgment.  (*Id.*, PageID.806 (citing D.N. 78))

In his reply, Williamson contends that his motion is "timely filed based on the [C]ourt's February 2023 and March 2023 rulings."  (D.N. 88, PageID.810)  As an initial matter, the Court notes that the scheduling order filed on June 1, 2022, set the following deadlines: (1) September 1, 2022, for discovery; and (2) October 15, 2022, for dispositive motions.  (D.N. 55)  Williamson ignored these deadlines by filing his motion more than five months after the latter deadline.  (D.N. 86)  And noticeably absent from the docket and Williamson's motion is any explanation for the delay or request for an extension of time to file the motion.  (*Id.*)  As such, the motion is untimely, *see* Fed. R. Civ. P. 56(b), and therefore grounds for denial.  *See Celotex Corp.*, 477 U.S. at 326. "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua*

*sponte*, so long as the losing party was on notice that []he had to come forward with all of h[is] evidence." *Id.*  Here, Williamson was on notice by virtue of U of L's motion for summary judgment filed on October 14, 2022 (D.N. 78), and  he was provided "reasonable opportunity to respond to all issues to be considered by the [C]ourt." *Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970, 971 (6th Cir. 1989) (citing *Portland Retail Druggist Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 645 (9th Cir.1981)).  Nevertheless, because Williamson is proceeding pro se, the Court will construe his motion as a cross-motion for summary judgment and rule on the merits. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))).

As outlined above, Williamson alleges that U of L discriminated against him in violation of Title II of the ADA, 42 U.S.C. § 12132; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  (D.N. 14, PageID.81–83 ¶¶ 42–57)  "[T]he analysis that applies to ADA claims also applies to claims made under the Rehabilitation Act." *Gati*, 283 F. Supp. 3d at 626 (citing *Jakubowski*, 627 F.3d at 201).  Thus, "[g]iven the similarities in the two statutory provisions, [the Sixth Circuit has long] merged [its] analyses under the ADA and Rehabilitation Act." *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452 (quoting *Qiu*, 803 F. App'x at 836).  Williamson can therefore be granted summary judgment on his claims under each Act if he can make "either a direct or indirect showing of discrimination." *Id.* (citing *Gohl*, 836 F.3d at 682).  In support of his motion, Williamson provides: (1) an email exchange between Bigelow and U of L's Registrar Office (D.N. 86-1); (2) a copy of the notice informing him that his Pell Grant was reduced (D.N. 86-2); (3) a copy of the 2018 DRC Letter (D.N. 86-3); and (4) a copy of U of L's supplemental answer to his revised interrogatory.  (D.N. 86-4)  Because much of this evidence was considered on U of L's motion for summary judgment, the Court will repeat here some of the analysis.

### 1.  Direct Evidence

"Direct evidence explains itself"—that is, "[i]t does not require the factfinder to make any inferences before concluding that unlawful discrimination happened." *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452 (quoting *Martinez*, 703 F.3d at 916); *see A.C. ex rel. J.C.*, 711 F.3d at 697 n.3 ("[D]irect evidence of discrimination is, for instance, when an employer says[,] 'I fired you because you are disabled'" (quoting *Smith*, 155 F.3d at 805)).

### a.  Bigelow's Email Exchange

On November 19, 2018, Bigelow emailed U of L's registrar office and informed them that he anticipated ruling in favor of Williamson on his ADA grievance.  (D.N. 86-1, PageID.798–99) He explained that part of the remedy would include a change to a grade on Williamson's transcript; and therefore, he wanted to inquire about the process for taking such an action.  (*Id.*, PageID.799) Bigelow "envision[ed]" removing the grade and "replacing it with either (1) nothing, or (2) a belated W[ithdrawal]," with option 1 being his preference.  (*Id.*)  The registrar stated that "grades are owned [by] the instructor of the course, department chair, and dean of the instructional unit so [a grade change] would need to be approved by the Dean."  (*Id.*, PageID.798)  And thus the registrar office urged Bigelow to inform the instructor, dean, and dean's office of the forthcoming grade change.  (*Id.*, PageID.796–98)  Bigelow advised the registrar office that he had "no problem with consulting" with the instructor, dean, and dean's office; however, he emphasized that his determination was that "the department/instructor" was not at fault.  Rather, "it was the lack of clarity in Williamson's [DRC] accommodation letter."  (*Id.*, PageID.796–97)  Bigelow and the registrar office then discussed the potential implications that a grade change or any other alteration could have on Williamson's financial aid and status as a full-time student.  (*Id.*)  After determining that Williamson received "Pell Grant funds as well as Voc Rehab," the registrar office suggested

that Bigelow consult with someone in the financial aid office "before considering [deleting the grade] versus a withdrawal." (*Id.*, PageID.795–96)  Bigelow confirmed that he would do so before making a final decision regarding the appropriate remedy.  ((*Id.*, PageID.794–95)

Although Bigelow acknowledged that Williamson's DRC accommodation letter lacked clarity (*see id.*, PageID.796–97), Bigelow's emails with U of L's registrar office do not on their own establish that Williamson was discriminated against based on his disability.  Rather, it was merely a conclusion that the DRC letter should have more clearly established the parameters for when an extension may or may not be denied.  (*See id.*)  His conclusion, however, was not an admission of discrimination.  (*See id.*)  Any finding to the contrary requires the "inferential leap" that the DRC intentionally authored an ambiguous accommodation letter to discriminate against Williamson.  *See Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452 (noting that evidence that requires an "inferential leap" is not direct evidence of discrimination).  The Court is precluded from making such inferences under the applicable standard for direct evidence of discrimination, however.  *Id.* (quoting *Martinez*, 703 F.3d at 916).  Thus, the Court again concludes that Bigelow's emails are not direct evidence of discrimination.  *Id.*

### b.  The Pell Grant Notice

Williamson next provides a notice from U of L's financial aid office regarding his Pell Grant.  (D.N. 86-2)  The notice states, in part:

> Regulations require [that] we verify students have begun attendance or academically participated in all courses for which they have received Pell Grant funding.

> Your Pell Grant has been reduced, because the Registrar's Office received verification from the professor(s) of the course(s) for which you withdrew that you did not begin attendance or academically participate in the course(s) or no response was received by the Registrar's Office from your professor(s).

(*Id.*)  The notice makes no mention of Williamson's disability.  (*Id.*)  And the notice corroborates the evidence submitted by U of L.  Specifically, U of L provided evidence that Williamson enrolled in four classes during the fall 2018 semester but ultimately withdrew from two of the classes to "focus" on the grievance process.  (D.N. 78-2, PageID.594–97)  The withdrawals dropped his credit hours to six, which changed Williamson's status from a full-time to a part-time student and impacted Williamson's financial aid package for the 2018–2019 academic year.  (*See id.*, PageID.597–98; D.N. 79-20, PageID.683–84 (Williamson's "Summary of Account"); D.N. 78-19, PageID.678–80 (Williamson's "Financial Aid Revision"); D.N. 78-18, PageID.670–75 (detailing the return of federal student aid for "recipients who are deemed to have 100% withdr[awn] from coursework after beginning attendance and/or participation"))  In sum, the Court would be required to make impermissible "inferences before concluding that unlawful discrimination happened."  *See Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452 (quoting *Martinez*, 703 F.3d at 916).  Thus, the Pell Grant notice does not constitute direct evidence of discrimination.  *Id.*

### c.  The 2018 DRC Letter

Because the 2018 DRC Letter provided by Williamson is identical to the one provided by U of L in support of its motion for summary judgment (*see* D.N. 78-3; D.N. 86-3), the Court need not address it.  The Court incorporates by reference its evaluation of and determination that the 2018 DRC Letter does constitute direct evidence of discrimination.  *See supra* II.A.1.a.ii.

### d.  U of L's Supplemental Answer

Lastly, Williamson submits a copy of U of L's supplemental answer to his revised interrogatory.  (D.N. 86-4)  In Interrogatory No. 18, Williamson asked: (1) "Why ha[s] UofL's DRC add[ed] additional wording to Mr. Williamson['s] disability accommodation?"; (2) "Why has UofL refused to remove additional wording as Mr. Williamson has demanded?"; and (3) "What

is the undue hardship/ burden UofL DRC is claim [sic] requiring additional wording to Mr.

Williamson['s] DRC FNF?  (*Id.*, PageID.802)  U of L provided:

> **ANSWER:** Additional wording was added to the DRC letter for the Spring 2019
> semester in an effort to address any ambiguities.  Bigelow determined that previous
> letters could be updated for clarification and requested Williamson's input in
> crafting a remedy for this issue.  Williamson previously worked with Colleen
> Martin and Bigelow to draft additional language that would be included in future
> letter, but later refused to engage with attempts to determine an appropriate remedy
> including revising the DRC letter.  Please see documents previously produced and
> bates numbered UofL 000137 – UofL 000139 and UofL 000147 which are
> communications between Bigelow and Williamson requesting the opportunity to
> meet with him to discuss possible remedies.  Likewise[,] please see documents
> previously produced and bates numbered UofL 000220 – UofL 000221 and UofL
> 000269 – UofL 000277 which are meeting notes and communications between
> Williamson and University officials concerning the proposed language for his DRC
> letters.

> **SUPPLEMENTAL ANSWER:** The University incorporates its previous Answer
> to Interrogatory No. 18 as if fully restated herein.  Further responding, the
> University provided Williamson with an updated letter on January 7, 2019.  This
> new letter contained language to clarify when extended time should be given.
> Specifically, the updated letter provided one and one-half times extended time on
> writing assignments, unless doing so would prevent Williamson from completing
> new coursework.  This updated language remedied any supposed issue with
> Williamson's old DRC letter.  Rather than requiring a professor to "consider"
> extended time, Williamson was expressly entitled to extended time, so long as the
> extension will not prevent him from progressing to new material in the course.  The
> new language places the burden of substantiating a denial to accommodate on the
> professor, not on the student.  Because this language sufficiently protected
> Williamson's rights, his request to remove this wording was properly denied.

(*Id.*, PageID.802–03)

The plain language of U of L's answers does not provide any evidence that U of L

discriminated against Williamson based on his disability.  (*See id.*)  In fact, the answers show that

U of L was aware of Williamson's disability; provided him accommodations; solicited his input

in revising the DRC letter; updated the language of the DRC letter to guarantee Williamson

extended time "so long as the extension will not prevent him from progressing to new material in

the course"; and placed "the burden of substantiating a denial to accommodate on the professor,

not on . . . [Williamson]." (*Id.*)   To find that U of L's answers are direct evidence of discrimination, the Court would be required to make "inferences before concluding that unlawful discrimination happened." *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452 (quoting *Martinez*, 703 F.3d at 916).  Such inferences, however, are improper under the applicable standard for direct evidence of discrimination.  *Id.*  Thus, U of L's answer and supplemental answer do not constitute direct evidence of discrimination.  *See id.*

In sum, the evidence provided by Williamson does not compel the conclusion that discrimination occurred.  *See id.*  Accordingly, Williamson must establish his disability-discrimination claims through an indirect showing of discrimination.  *See id.* (citing *Gohl*, 836 F.3d at 682).

### 2.  Indirect Evidence

To prevail on an indirect showing of discrimination, Williamson "'must meet the requirements of the familiar *McDonnell Douglas* test,' which [courts] apply to both statutes."  *Id.* (quoting *Gohl*, 836 F.3d at 682).  Williamson must make out a prima facie case of discrimination by showing that "(1) [he is] disabled; (2) [he is] 'otherwise qualified' to participate in the public program; (3) [he was] subject to discrimination because of [his] disabilit[y]; and (4) the program receives federal funding (for the Rehabilitation Act only)."  *Id.* at 452–53 (citing *Gohl*, 836 F.3d at 682).  Williamson fails to make such a showing, however.

It is undisputed that Williamson satisfies the first, second, and fourth elements of a prima facie case of discrimination; therefore, again only the third element—causation—is at issue.  (*See* D.N. 78-3, PageID.612 (acknowledging that Williamson "has documentation of a qualifying disability" and that he has been approved for accommodations); D.N. 78-20 (detailing the federal funding provided to Williamson while enrolled as a student at U of L); D.N. 78-1 (arguing that

Williamson fails to establish causation); D.N. 87 (same))  "[T]o establish the causation that both Acts require, 'the plaintiff must establish a but-for relationship between the protested act and the individual's disability.'"  *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 453 (quoting *Gohl*, 836 F.3d at 682).  The ADA requires Williamson to "present 'sufficiently 'significant' evidence of animus toward the disabled that is a but-for cause of the discriminatory behavior.'"  *Id.* (quoting *City of Blue Ash*, 798 F.3d at 357).  And § 504 requires Williamson to show that U of L and its employees "discriminated against [him] 'solely by reason of' [his] disability."  *Id.* (quoting 29 U.S.C. § 794(a)).  Notably, under each Act, Williamson "must present evidence of how the school treated comparable, non-disabled students."  *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992)); *see Gohl*, 836 F.3d at 683.

Noticeably absent from Williamson's cross-motion (D.N. 86) is any evidence that U of L or any of its employees had "animus toward the disabled that is a but-for cause" of the alleged discriminatory behavior, *Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 453 (quoting *City of Blue Ash*, 798 F.3d at 357), or "discriminated against him 'solely by reason of' [his] disability."  *Id.* (quoting 29 U.S.C. § 794(a)).  Moreover, his cross-motion is devoid of any evidence regarding U of L's treatment of comparable, non-disabled students.  (*See* D.N. 86)  And such a failure is fatal to Williamson's ability to make a showing of discrimination via indirect evidence.  *See Akron City Sch. Dist. Bd. Of Educ.*, 1 F.4th at 452–53.  In "'the absence of evidence of a well-treated comparator, [Williamson] cannot prove that discrimination against the disabled was the reason for' [his alleged] mistreatment."  *Id.* at 453 (quoting *Gohl*, 836 F.3d at 683).  In sum, Williamson's disability-discrimination claims fail because he has not provided any direct or indirect evidence from which a reasonable jury could find that he was "subject to discrimination because of" his

disability.  *Id.* (citing *Gohl*, 836 F.3d at 682).   Accordingly, Williamson's cross-motion for summary judgment will be denied.  *Id.*

## III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)   U of L's motion for summary judgment (D.N. 78) is **GRANTED**.

(2)   Williamson's cross-motion for summary judgment (D.N. 86) is **DENIED**.

(3)   A separate Judgment will be issued this date.

August 9, 2023

**David J. Hale, Judge**
**United States District Court**